**STATE OF CALIFORNIA, DEPARTMENT OF EDUCATION, Petitioner,**

v.

**William BENNETT, Secretary of Education, U.S. Department of Education, Education Appeals Board, Respondent.**

No. 87–7401.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 10, 1988.

Decided June 28, 1988.

Michael A. Hersher, Staff Counsel, California Dept. of Educ., Sacramento, Cal., for petitioner.

Jaime Fernandez, Office of the General Counsel, U.S. Dept. of Educ., Washington, D.C., for respondent.

Before BROWNING, Chief Judge, ALARCON and NORRIS, Circuit Judges.

PER CURIAM:

California petitions for review of the Secretary's determination that it must repay approximately $2.7 million in federal grant monies paid to California to reimburse it for unemployment insurance contributions on behalf of school employees. California argues liability is barred by the statute of limitations on claims for refund of improperly expended education grants, 20 U.S.C. § 1234a(g). We deny the petition.

## I

The United States Department of Education reimburses California for its costs in providing certain educational activities. In 1976 the Department realized California was making unemployment insurance contributions at a higher rate for federally-assisted programs than for other education programs. California concedes this discrimination violated the regulations requiring states treat federally-assisted education activities "equitably" and "uniformly" relative to other state education activities.[1]

The Department informed California of the problem, but took no formal action to recover any excess unemployment insurance contributions until 1985. The overpayments resulted in reserves in the unemployment insurance fund for payment of claims from federally-assisted employees which were disproportionately large relative to the reserves for payment of claims from other employees. The Department's finding (not challenged on appeal) was that on December 31, 1980, reserves for claims from federally-assisted employees were sufficient to pay 13.8 years of benefits, while reserves for regular employees were sufficient to pay 2.8 years of benefits. Taking the reserves maintained for claims of regular employees as the "benchmark," the Department calculated that $18.4 million of the reserve for federal claims was "excess."

On December 31, 1984, the Department issued the demand letter that resulted in these proceedings. The Department did not seek to recover excess contributions made prior to 1980. Instead it demanded return of payments made to the fund on behalf of federally-assisted employees during the year 1980. The Secretary's theory was that these payments were unauthorized because at the time they were made, reserves in the fund for payment of claims from federally-assisted employees were in excess of the reserves determined by California to be sufficient for the payment of claims from other employees.[2]

## II

The parties agree that direct recovery of pre–1980 overpayments is barred by the five-year statute of limitations, 20 U.S.C. § 1234a(g), which states:

No State and no local educational agency shall be liable to refund any amount expended under an applicable program which is determined to be unauthorized by law if that expenditure was made more than five years before that State or local educational agency is given the notice required by subsection (a) of this section.

Since it is undisputed that the $2.7 million the Secretary seeks to recover was "expended" in 1980 when California placed it in the unemployment insurance fund,[3]

---

1. See 34 CFR Part 74, App. C, Parts I(C)(1)(d) and II(B)(13)(b).

2. The Final Letter of Determination (FLD) and the Final Decision of the Department contain some references which suggest the Secretary's claim rests on the fact that the excess reserves were an accumulation of payments that were themselves excessive. However, the thrust of the Letter and Decision was that the 1980 payments sought to be recovered were paid into the fund when the reserve in the fund for payment of claims of federally funded employees was in excess of the reserve maintained for the payment of claims of employees who were not federally funded. Thus, the Final Decision states: "The 'central conclusion of the FLD' is 'that all of the 1980 contributions attributable to ED programs were, by definition, excessive.' ... *This conclusion is correctly based on the existence of excess SEF cash reserves attributable to SF (i.e., mainly federal) programs as of Decem-*

ber 31, 1979." Final Decision at 14 (citation omitted; emphasis added). The Decision concludes: "It is clear, therefore, and this panel so finds, that there is sufficient evidence in the record to support ED's claim that the treatment of the federal programs with respect to the SEF was discriminatory and improper, that there was an excessive SF reserve balance as of December 31, 1979, that all the SF collections from federal programs in calendar year 1980 were excessive and that ED is entitled to recover all such collections made during the period January 3—December 31, 1980." *Id.* at 15. *See also id.* at 3, 4, 7, 13, 16.

3. It is clear that when grant funds are placed by a grant recipient in an account reserve, rather than spent on educational services, they are nonetheless "expended" within the meaning of the statute. *See Appeal of Los Angeles Community College District,* EAB Docket No. 26–91–81 (May 17, 1984).

the Secretary's excess reserve claim fits within the letter of this statute.

Ordinarily, the process of statutory interpretation would end here. "[I]n the absence of a clearly expressed legislative intention to the contrary, the language of a statute itself must ordinarily be regarded as conclusive.... Unless exceptional circumstances dictate otherwise, when we find the terms of a statute unambiguous, judicial inquiry is complete." *Burlington Northern R.R. Co. v. Oklahoma Tax Comm'n,* — U.S. ——, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987) (quotation marks and citations omitted).

California argues this is a case involving "exceptional circumstances" (*id.*) where "a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *United Steelworkers of America v. Weber,* 443 U.S. 193, 201, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480 (1979) (quoting *Holy Trinity Church v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892)). California argues the Secretary is really attempting to recover the pre–1980 discriminatory payments that have accumulated in the unemployment insurance fund, and that allowing recovery of these payments would be inconsistent with Congressional intent underlying the limitations provision.

The only relevant expression of Congressional intent is found in the House Committee Report:

> The Committee has adopted this amendment because it believes that such a five-year "statute of limitations" will lead to better administration of ESEA programs. It will encourage HEW to make audits more promptly than has been the case. It will also remove the threat presently hanging over the heads

of school administrators that some day, some time, they may be forced to make repayments of expenditures made many years before.

H. Rep. No. 805, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Ad. News 4093, 4160.

These purposes will be served by the Secretary's application of the statute. The Secretary may recover only overpayments made within the preceding five years and must plan and execute his audits accordingly. The test for liability is straightforward and rests entirely on the presence of a condition immediately apparent from a simple analysis of the reserve account: payments to the fund on behalf of federally-assisted employees, if made when the reserve for claims for federally-assisted employees is excessive as compared with the reserve for other employees, are unallowable and subject to a claim for refund for five years. Such a clear test can leave no doubt in the minds of state officials as to what is expected of them. By contrast, California's insistence on inquiring in each instance whether an excess reserve was created by unlawful or lawful payments would call for reconstructing the origins of a fund balance created over the course of many years, a task which is administratively impractical for the parties and the courts. We think requiring such an inquiry would ill serve Congress' intent to streamline the audit process.

Congress' primary concern—that local agencies may be unable to repay misexpenditures many years after they occur[4]—is not implicated: if there are no excess funds in the reserve account, the Secretary has no basis for recovering contributions to that account. Surely Congress did not intend to allow states to continue to collect

---

**4.** The "threat ... hanging over the heads of school administrators" referred to by the House Committee was not that reserves might be tapped, but rather that schools would be forced to cut services to repay funds which had already been paid out to school employees or suppliers. This is confirmed by the testimony of school officials before the House Committee. *See* 2 *Elementary and Secondary Education Amendments of 1973: Hearings Before the Gen'l Sub-*

*committee on Education of the House Committee on Education and Labor* (hereafter "Hearings") 93d Cong., 2d Sess. 1733 (statement of August W. Steinhilber, Director, Federal and Congressional Relations, National School Boards Association); 1 *Hearings* at 811 (statement of Charles Wolfe, General Superintendent, Detroit Public Schools). Repaying the federal government from money held in reserve does not present these practical problems.

grant monies to pay for unemployment insurance benefits when it is clear there are already sufficient reserves in the fund to cover those benefits.

The Secretary's interpretation would not render the statute of limitations meaningless, as California contends. The Secretary must demand repayment within five years of payment of federal grant money into a reserve account already adequate to pay claims under a state's own standard. Earlier improper contributions are not recoverable. The distinction is not illusory. In this case, for example, there were $18,449,000 in excess reserves in the fund at the end of 1980, but the Secretary seeks to recover only $2,752,000, the amount of the contributions for federally-subsidized employees during 1980. If for any reason the annual contributions were to cease—through termination of the program, for example—the Secretary would be unable to recover the remaining $15.7 million in excess reserves. The limitations period also applies to claims for repayment based on violations other than maintaining surplus reserves.

We reject California's contention that this excess reserves claim should be time-barred because it is dependent on claims that are time-barred. The two types of claims are in fact independent: an excess reserve could arise not only from discriminatory contributions, but also from a disproportionately low pay-out on behalf of federal programs.

Since assessing whether the spirit of the statute of limitations has been met in this case requires "reconciling conflicting policies" and "more than ordinary knowledge respecting the matters subjected to agency regulations" (*Chevron, U.S.A. Inc. v. Natural Resources Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)), any lingering doubt about legislative intent must be resolved in the Secretary's favor.

California argues that less deference is due because the Secretary's position in this case is inconsistent with his earlier views in *Appeal of Los Angeles Community College District,* EAB Docket No. 26–91–81 (May 17, 1984). In *Los Angeles,* the Secretary decided only that an overpayment outside the limitations period could not be recovered because the local agency had not yet spent the funds. The funds the Secretary seeks to recover in this case were "expended" by California, within the meaning of the limitations provision, when they were placed in the reserve during 1980.[5]

California analogizes this case to a contract or property dispute, and notes that in such cases the limitations period is not extended merely because a defendant places proceeds of a contested transaction in a bank account rather than spending them.[6] In such cases, however, the deposit of proceeds in a bank account is not an element of the cause of action. Here, the heart of the claim is placing federal money in a reserve fund when the amount already in the fund for federal activities is in excess of that found by the state to be sufficient for non-federal activities.

PETITION DENIED.

---

**5.** See *supra* note 2.

**6.** We accept the validity of this proposition, but note with disapproval that it is unrelated to the case cited by California, *Blanton v. Anzalone,* 760 F.2d 989, 992 (9th Cir.1985).